States v. Natalizio. Mr. Dreyfus. May it please the court. This court should reverse the jury's verdict because the jury is not sufficient to support the guilty verdicts against Mr. Natalizio and reversal is required for three reasons. First, the only shred of direct evidence that Natalizio had the requisite intent to commit mortgage fraud was derived from the internally inconsistent testimony of the government's cooperating witness Jason Streber. Second, the government provided no direct evidence that Mr. Natalizio was guilty beyond a reasonable doubt. And third, the circumstantial evidence presented by the government alone could not compel any jury to establish that Mr. Natalizio was guilty beyond a reasonable doubt. And so for these three reasons, there was insufficient evidence for any jury to find requisite intent beyond a reasonable doubt. As this court knows, in order to establish a mail fraud case, the Natalizio intentionally participated in a scheme or artifice to defraud another of property or money. And really the core of our argument here is that the government failed to prove any willful act by Natalizio with specific intent to defraud. And the issue we raise here relates to the testimony of the government's cooperating witness Jason Streber. And central to his testimony... ...is that Natalizio's name appeared as the interviewer on five of the fraudulent loan applications despite the applicants testifying that they never met Natalizio. Correct. Is that correct? Correct. So... Well, doesn't that make him a fraud? Well, no, Your Honor. It sort of cuts both ways because he wasn't... he didn't meet the straw buyers. So I understand the government's perspective. They would say, well, clearly he was signing this without them being present. But the other argument, our argument, is he didn't sign it at all. He wasn't there. No one testified that he ever met the buyers at all. And so really all of the information that directly ties... So who put his name on the application? We don't know, but in light of that, we believe that there's certainly doubt as to whether it was Mr. Natalizio. What did he do? So Mr. Natalizio was the owner of the mortgage company, United Mortgage, that was used, or their paperwork was used, to write all these loans. And he was a loan processor on a number... or not a loan processor, the loan officer on a number of these loans. And Mr. Strieber... So whose money's going out the door then? So it would be the bank. Yeah, not his. Correct. So he's the person that is approving all this as a, whatever you want to call it, a loan officer or something. Correct. So the bank is relying on him. Sure, absolutely. Okay, well that's pretty important. It is, but the issue is whether he knew that he was involved in the fraud at all. He's approving loans all day, every day. He's got plenty of customers that are coming in, they're asking for loans, and he's, you know, sending them off. The issue is... And someone else is putting his name on these applications? That is a strong possibility, and we believe certainly that that creates a certain amount of doubt, because there was no testimony that the government was able to elicit that Mr. Natalizio ever met any of the buyers. He was never at a closing. He never paid the government's cooperating witness any money. He was never involved in the whole down payment scheme. Some of the straw buyers were advanced, or advanced the down payment costs so that they could appear credible to Mr. Natalizio. He wasn't involved in any of that. Did he do this in all the loans he was involved in? He says he does this all day long, so that's the way he does it. Doesn't know the buyer, doesn't know, doesn't see these people. Is this typical? No, I would say it's not. So you're saying if his name was on there, he didn't... It wasn't typical, then. He didn't participate. Somebody just stuck his name on there. Well, what I would say to that is that just because his name appeared, that doesn't mean that the government proved a willful act by Mr. Natalizio. There's got to be a willful act, and really the only thing that the government tried to do was give a post-it note. And did Mr. Natalizio give a post-it note to a bank employee relating to certain verifications of deposits? And Mr. Striever, the government's witness, was cross-examined on this vigorously. He was repeatedly impeached. At one point, he was interviewed by the FBI multiple times. In the initial interview, he never mentions Natalizio. In fact, in the second interview, he never mentions Natalizio. And then in the second interview, the government's witness says, it's Klobotitz. He was one of these guys with this Snap Holdings company. And then a month before trial, it comes to him, oh, it might have been Natalizio or Klobotitz. And then at trial for the very first time, he zeroes in solely on Natalizio. When here he is, he's a you know, this is the greatest value to him now to give favorable testimony to the government. And we believe that his testimony should be discarded. Was there any evidence as to who put his name on these fraudulent applications? I don't believe so. You know, it was his company, so he was, you know, the head honcho there. But in terms of who actually signed that, I don't know specifically. But importantly, he wasn't at the closings. And we need that. What do you mean importantly? It's pretty important if those applications, if he put his name on it. He put his name on fraudulent applications. The fact that he didn't appear at the closing is irrelevant. I agree with you. But the question is, did he put his name on the application? Or was it? His name appears, and apparently there's no evidence that he did it himself. And to convict Mr. Natalizio, you would require a willful act by him. So the people who work for him just attach his name to documents without consulting him? It's possible. Obviously, that's not a best practice. It doesn't sound likely. Well, we don't know. But because we don't know, and because the government couldn't prove that specifically Mr. Natalizio didn't make that willful act. Was the jury told by anybody, lawyer or otherwise, that he didn't sign it? I'm not specifically sure. I'd have to dig back into it. I know you didn't try the case, so I'm not blaming you. Did somebody hint around at the jury this is a forgery? I think the fact that he... No, no, no, no. Let's see. I don't know. I don't know, Your Honor. There you go. That's a third possibility. Yes, no, or I don't know. And with that, we're requesting reversal because it was insufficient evidence, and I'll reserve the remainder of my time. Okay. Thank you. Thank you, Mr. Judge. Mr. Petro? Counsel, may it please the Court, Your Honors. I also have an insufficiency argument, but it's in the jury room, and I just want to say that my insufficiency argument is in the briefs, but essentially we have a situation where my client is accused of funneling down payment money to the buyers from the sellers. The down payment checks, these alleged down payment checks... Because I understand that your brief wasn't that the indictment went back. It was redacted indictment that went back. Well, it was the government's redacted indictment, which took certain superficial language. Right, but the indictment itself frequently goes back to the grand jury, to the regular jury anyway, doesn't it? And it shouldn't. Well, it does, and it's been doing for about 200 years. I don't know. We suddenly come to the conclusion the jury shouldn't know what the defendant is charged with before they're making up their mind what they're going to do. Well, I think what the judge, the district court judge is commanded to do is to look at the indictment back to the jury. He can. Well, there we go. But she shouldn't have in this particular case because... Oh, this is a unique case. It's not unique, but we should have... I offered a redacted version of the indictment also, which was rejected by the court. So each one of you offered a redacted indictment, and judge choose one or the other. Yes, and the reason why... What was the worst thing that he left in the indictment that you would have liked to have taken out? The worst thing is that there were names in the indictment that were mentioned during the trial. Well, that's not surprising. But the whole purpose of... But what? I don't understand. The indictment would, of course, describe the charges. Charges involve people. But the whole good night was no proof of anything. It was just a way to get the case to trial. Well, that's what I want to break apart for the court right now. If the whole purpose of jury instructions is to prohibit improper inferences by the jury, let's look at why she allowed this indictment to go back. And she says specifically because their names and it shows... It's routine to send the it's also routine to redact the indictment... To eliminate all the names? I think that you should eliminate names. What do you say? Is that customary that the indictment sent to the jury eliminates all names? I think that if... Well, answer my question. It's a yes or no question. I would say that we do eliminate names frequently, especially for people that have pled guilty and things like that. That would be routine for the court to eliminate those names from the indictment. Right. But in this particular case, if she's saying that we want to give... She basically says there's names that they heard during the trial and it will give them context. That means she's allowing the jury to draw inferences from this particular indictment. And it's no different than having the government sit in the jury room. It's a document... It is a little different, so you know, calm down. Thank you, Judge. This is something that I have a certain amount of passion for because... I got that impression. Well, we fight so hard to prohibit these improper inferences to the jury and then this document that's created by the government goes back... Well, give a concrete example, okay? A name that's in the indictment that you think was very harmful to have the jury see that. Okay, so what would be an example? Stephen Klebicits, Thomas Hyland, Dione Cardone. Look, I asked for an example, not for a list. Now give me one name where you think its inclusion in the indictment was harmful to the defense. Stephen Klebicits. Pardon? Stephen Klebicits. And why was that harmful? Because Mr. Klebicits never testified and he was the main actor in this particular case and because the indictment went back to the jury, they were able to... And what did it say about him? Well, they connected dots... What did it say in the indictment about him that was left in, that was not redacted? My particular complaint with the indictment... Look, would you just answer my question? What did the indictment say about this person that you find objectionable? That he was a co-conspirator? It attributed conduct to Mr. Abadie that was not proven by the government. What about... You say Abadie. Well, I don't understand. My client is Joseph Abadie. I know that. I'm asking for an example of someone's name in the indictment and you said Clevenson? Klebicits. And I'm asking you, what is it about his inclusion of his name that was harmful to Abadie? It lays out in the details a scheme where Klebicits enlisted Joe Abadie to funnel down payments to the buyers. But that's what all indictments do. They lay out in detail what happened, which sums up to the charge. Well, in this particular case, the indictment goes too far against Mr. Abadie. But surely the government in its opening statement would have said the same thing, right? Well, the government... Answer my question. Didn't the government say the same thing in its opening argument? They did. Yes. So what's the big deal? The jury's allowed to take notes, isn't it? And that should be enough. Notes are neutral and it encourages deliberation. They know that the indictment is prior to the trial, right? Correct. So why would that be such poison? In this particular case, the poison comes from the word recruiting, that Joe Abadie recruited straw buyers to the scheme. But again, the opening statement would have said that, right? Joe Abadie, the evidence showed that... Wouldn't the opening statement have said the same thing? The government's opening mentioned that Joe Abadie recruited people to the scheme. The evidence proved otherwise. Did it mention his fellow clevison? Clevisits? Clevison? They did. Okay. My thrust of my argument is that the down payment checks were delivered after the closing, that the key meeting regarding Patricia Wold accepting bribes to cash the checks early, there's no evidence that my client was aware of that meeting or attended that meeting. And basically, it's a simple argument. You can't deliver a down payment after the closing is over. But I made this argument to the jury and that's where the indictment comes in. Because if they wouldn't have had that indictment, they would have acquitted Mr. Abadie. Thank you, Judge. Okay. Well, thank you very much, Mr. Petro. Mr. Srivastava? Good morning, your honors. May it please the court. Ankur Srivastava on behalf of the United States. There was more than enough evidence to convict these defendants. First, as to the evidence against Appellant Natalizio, there was a paper trail that conclusively established his knowing involvement in this scheme to defraud. That paper trail began with 11 fraudulent loan transactions, which went to lenders, which were used to secure loans that were fraudulently issued because those applications contained false information. False information about the buyer's or borrower's income and assets, about whether they plan to use the funds to purchase a property as their primary residence, as to the source of down payment money. And for each of those 11 transactions, Natalizio was the loan officer. The best evidence that he was a loan officer comes from his own company's records. And the evidence that was introduced at trial is that United Natalizio was a company that Natalizio co-owned, and that that company had an internal record-keeping system, which was used to assign credit for closings. And based on that internal system, the government introduced evidence that 14 commission checks were issued by title companies in connection with these 11 fraudulent loan applications. And for each of these 14 checks, an employee at United Mortgage Services handwrote the name Joe at the bottom of each check to signify that he was the loan officer for those checks, according to his own company's records. And to answer a question that Your Honor, Judge Bauer had in the earlier argument, there was no argument made at trial that Natalizio did not submit these loan applications or that someone signed his name to them. What was argued at trial is that the buyers and everyone else involved in the scheme. And the jury correctly rejected that argument based on the fact that he was the loan officer for these 11 transactions, he received the commissions for these 11 transactions, and each of the borrowers, seven borrowers, came to trial and testified that even though they were supposed to have met Natalizio or another employee of United Mortgage Services, they never did so. So that false information that was contained in those loan applications came from Natalizio. Turning next to Abade, the paper trail with respect to him also conclusively established that he was a knowing participant in the scheme to defraud. And it's laid out in some detail in our brief, but just as a quick example, there's a transaction with respect to 5422 South Laughlin, and the evidence that the government introduced was that Snap Entities Enterprises, or the seller, gave a check to APJ Consulting, Abade's company, for $43,700. Abade skimmed $5,000 off the top. He then gives a check to the cooperating witness Jason Strever for $38,700, and Strever used that check to purchase the cashier's check that the buyer would use at the closing. And what's noteworthy about this particular transaction, 5422 South Laughlin, is that in the memo line of the check itself, it actually says 5422 South Laughlin Closing. So clearly when Abade receives this check from the seller, he knows exactly what that check is to be used for, because it says Closing in the memo line. So Mr. Dreyfuss said that Strever's other witnesses. Your Honor, there was nothing exceedingly improbable or internally inconsistent about Mr. Strever's testimony. The jury was in the best position to assess his credibility, to view his demeanor, and... Did he have to retract the statements under cross-examination? Was he whacked about by the lawyers? He was cross-examined at length. He didn't retract any statements to my recollection. There was some testimony where he was impeached in the sense that what he said at trial wasn't specifically disclosed in a previous interview with the FBI, but there was nothing inconsistent about it. Something was left out or something in it. The jury heard all that, didn't they? Didn't they determine the credibility? That's exactly right, Your Honor. The jury heard all of the arguments that are being made now, and they rejected those arguments and credited the testimony of Jason Strever. So if there are no further questions at this time, Your Honors, we would ask that the convictions and sentences to both defendants be affirmed. Thank you, Mr. Strever. Mr. Dreyfuss or Mr. Petro, do you have anything further? Okay, Mr. Petro, do you have anything further? I have a waive to thank you, sir. Okay, well, and you were appointed, were you not? Yes, I was. Well, we thank you for your efforts on behalf of the defendant.